Good morning. Good morning, Your Honor. May it please the court. My name is John Klein and I represent the appellant, Keith Gartenlaub. I'd like to reserve five minutes for my rebuttal. And I think after my argument, there will be a five-minute argument from the amicus. All right. Thank you. After your argument or after – okay, they're going to proceed after you. Okay. Whatever the court pleases. Yeah, that makes sense. That does make sense because you would have to argue against both. And that way the government gets to respond to the amicus argument as well. That makes sense. All right. This case is at the intersection of two dynamic areas of law. One is the Fourth Amendment implications of searches of computers and other digital devices. The other is the Foreign Intelligence Surveillance Act, which does away with traditional notions of probable cause and functions almost entirely in secret. And what happened here, the Foreign Intelligence Surveillance Act produced a search, a two-day secret search of Mr. Gartenlaub's home and computers, followed by the imaging of his computers. It's called a sneak and peek search. They don't tell you that they're searching and they don't take the computers. They simply image them. The images of the computers were then taken back to the FBI lab somewhere, reviewed for months. Of course, there was no evidence of foreign intelligence on them. What was found instead was child pornography. And ultimately the information that was derived from this sneak and peek search in January 2014 was used to obtain an ordinary warrant. And that seized again what the government had already seized and searched. And, of course, ultimately Mr. Gartenlaub was prosecuted not for any sort of foreign intelligence crime or activity, because he was not engaged in any, but for the possession of child pornography. On the Fourth Amendment issues, we've raised three issues here, all of them addressing principally the January 2014 search. Now, derivatively they also affect the August 2014 search, because it was the fruits of the January search that produced the August warrant. But it's the January 2014 sneak and peek FISA search that really is the focus of our arguments here. The first two arguments, one of them is probable cause and the other is fact. Of course, we are disabled from being able to argue those points effectively, because we've never had access to the underlying FISA application and order. When the government went before the Foreign Intelligence Surveillance Court, it was required to make a showing of various things. One of those things was probable cause to believe that Mr. Gartenlaub was the agent of a foreign power. And that foreign power here could only have been China. There's no other foreign power that's ever been mentioned. And, of course, to be an agent of a foreign power under the statute, you have to, in terms of the terms that the legislative history uses, you have to be in a principal agent relationship with the foreign power. So, in other words, the government somehow convinced the Foreign Intelligence Surveillance Court that Mr. Gartenlaub was in a principal agent relationship with the government of China. Now, he wasn't. And we don't know, of course, because we haven't had disclosed to us, what the government told the Foreign Intelligence Surveillance Court to convince it of that, or to convince it that there was probable cause of that. But, again, disabled from being able to focus specifically on what the government told the Foreign Intelligence Surveillance Court, we dispute that there was probable cause for that. We also contend, again, without being able to see the actual application, that there are likely to be Frank's issues here. And we say that because there is no evidence, and it was never the case that Mr. Gartenlaub was functioning as an agent of a foreign power, as conducting clandestine intelligence activities on behalf of China, which is, again, the theory that the government must have gone to the Foreign Intelligence Surveillance Court on. I'll talk about disclosure at the end. But this case highlights in the most excruciating way the tension between the Foreign Intelligence Surveillance Act, the way it's been interpreted, and the mandate of Frank's in the Fourth Amendment. Judge Rovner's concurrence in the Daoud case, which we cited extensively, captures, I think, in quite some detail and quite accurately, the problem. The problem with raising a Frank's argument in the absence of disclosure is that the court, whether it's the district judge or your honors, can read the application all day long, and you're not going to know whether the things that it says are true. Similarly, you're even less likely to be able to tell if there are material omissions in the application to the Foreign Intelligence Surveillance Court. You understandably, because of your role in the process, you don't have access to the information that an advocate for Mr. Gartenlaub would have. So there's probable cause and there's Frank's. The argument that we've been able to make in full, because it doesn't require access to the underlying application and order, is the scope argument, and that gets to the comprehensive drug testing case and the two opinions in that case, the majority opinion and the concurring opinion. And what I will say is this. What happened in this case is exactly the scenario that both the majority and the concurrence in the CDT case warned against. In other words, you have a search that is authorized for a particular purpose, and here the only thing the Foreign Intelligence Surveillance Court can authorize a search for is foreign intelligence information, which is defined in the statute. And although sometimes the definition can seem broad, it certainly doesn't encompass child pornography. So there is a search authorized for foreign intelligence surveillance information. Now, the government's theory in this search and in all other computer searches is foreign intelligence information could be hidden anywhere. It could be in a JPG file. It could be in a file labeled with a child pornography-like name. And therefore, we have to search every single file on the computer to see if they contain foreign intelligence information. Yes, but how do they search them? I mean, they don't go frame by frame when they've got a huge volume. They use different programs to search. Well, and of course, again, because of the secrecy cloaking this entire process, we don't know exactly what they did to search or whether there was a protocol laid out in the underlying FISA application and order. But it really doesn't matter for our argument whether the search means that they go literally file by file with a human, you know, clicking them open on the screen, which is possible, or whether it's done through some sort of a hash-type search or a keyword search. The bottom line is the government feels that it is authorized in searching a computer to search, by whatever means, every single file on the computer because of the possibility that what it is authorized to search for will be lurking in some file with a misleading or- Well, but they do have minimization procedures. Minimization addresses something completely different, Your Honor, and I'm glad you raised that because it's an argument that the government always makes. Minimization is what you do with something you've lawfully seized that is not within the scope of the original warrant. And that can happen. It happens primarily with electronic surveillance. The ISA case is a good example of that. That's this case out of Missouri where they were listening under FISA to somebody's, you know, in real time to somebody's discussions in their home, and they hear a murder being committed. And so that is not foreign intelligence information, the commission of the murder, but it is evidence of another crime. It was lawfully acquired, and under the minimization procedures, having lawfully acquired that information, you then look to the minimization procedures to see what can be done with it, and it can be used to prosecute that ordinary crime. Our argument here, you never get to minimization because our argument here is that the seizure and search of the child pornography files was illegal. It violated the Fourth Amendment. And so it's not a question of minimization of something that was lawfully seized. It's a question of suppression of something that was unlawfully seized. You're talking about the January search or both? The January search. The problem with the August search, Your Honor, is that it was based on overwhelmingly on evidence obtained in the unlawful January search. And so that implicates a whole other theory that the government shouldn't be able to take what it finds in the FISA search under a lesser Fourth Amendment standard and then use it as a basis for getting the August warrant. Well, that's not exactly it. I would say this. If they had obtained the evidence in the FISA search lawfully, then they likely would have been able to use it in obtaining another conventional warrant. But because they obtained it unlawfully in violation of the Fourth Amendment, they cannot then use it to go and obtain a conventional warrant, and that's the wandless case from this court that the district court sided and the district court sided. What should the government do when it's searching an electronic file for foreign intelligence data and it comes across files that are labeled with various labels, on their theory that what we should be able to look into them, because obviously if you're trading in foreign intelligence, you're not going to keep it open. It's not going to just be sitting there for anyone to see it on a database. I understand the question. And in the CDT case, the court seems to have accepted the premise that a computer search necessarily is going to involve the search of everything on the computer for just the reason that you've identified. Well, so I was on that panel and wrestled with those. I think Judge Gold might have been on that panel, too, and wrestled with those issues. And I think the main problem we had was that in CDT, the government was authorized to look at the files pertaining to certain individuals, I believe Barry Bonds, and instead they went further and looked at the drug testing files for other baseball players. So it was like that search was not authorized. They were not the subjects of the warrant, and the warrant was circumscribed that way. Here the warrant is any foreign intelligence data. It's not narrower than that. Do you see what I'm saying? I'm with you. But I think it's the same principle. Because in the CDT case, they were authorized to search, I think, for eight identified players. But to find out if information about those eight players was in the database or whatever they were searching, they had to search everything. No, they didn't. They had the plain view argument. They said, well, we found all of this, and then we were authorized to go in there and look at this data, and the data pertaining to other baseball players was in plain view. That's right. And that's exactly the situation here. The government is authorized to search for foreign intelligence information, presumably by the Foreign Intelligence Surveillance Court. To search effectively for that information, they have to search. They maintain, and the CDT court accepted this argument, they have to search all the files on the computer because it could be hidden anywhere. And it was the same way in CDT. Those eight players' information could have been anywhere, so they were permitted to search everything. Here's where the problem comes, and it's the same problem here as it was in CDT. What do you do when you're searching all the files for what you're authorized to search for, whether it's the eight players in CDT or the foreign intelligence information here, what do you do when you come across something that is not encompassed in the warrant? And the government's answer in CDT, which the court rejected, was we can rely on plain view because we're permitted to look at it because we have to look at everything, and once we find something, if it's evidence of a crime, it's in plain view and we can seize it. And the problem with that, which CDT identified, both the majority and the concurrence is, it converts any search of a computer for a limited category of information, again, whether it's eight players or foreign intelligence information, into a general search. Well, but when we start talking about plain view and you look at the Wong case from the Ninth Circuit, there they were going through graphic images and they saw images of sexual acts by three-year-olds and up, so it was clearer to the agent that was going through looking at graphic images that you had child porn. Now, just hypothetically in this case, if it wasn't so clear, maybe depending upon how the search was being conducted and they had to refer it to another source, whatever metadata they had, I don't know what it was, but if they had referred to another source, then it wouldn't fall into the plain view exception, right? Well, that's true, but I understand the government to the extent they're sharing their arguments with us rather than just with you. I understand them to be saying that they are relying on plain view here. Maybe they are, but that doesn't mean we have to accept it. I couldn't agree with you more, Your Honor, and I hope you don't, but I think that's the theory, and the problem with that theory is the one that CDT identified, which is it makes any computer search into a general search for anything. Well, not if you don't have plain view. Not if you don't have plain view, and that was what the concurrent said in CDT. Judge Kaczynski and his concurrence, which at one point was a majority opinion, would have established basically a set of code, a set of rules for searching computers, which would have ruled out the use of plain view. The concurrence, the majority didn't go that far, but it certainly seemed to disapprove that general principle. Well, yes, but you can distinguish a plain view when you look at different factual situations. Wong, that was clearly a plain view. CDT apparently was a situation where they could tell that it was different players, so you had a more likely application of plain view. In this case, you may not, depending upon what the trial court reviewed in camera. And, of course, you don't know about that. We don't know about that, and that's a problem. All I will say is I do believe the government is relying on plain view here to justify it. But no doubt about that. Counsel, Judge Gould, if I could ask you a question just to clarify, please. So if the government in one of these FISA cases is reviewing computers under this sneak and peek procedure, and they get a bunch of files, and they have to look at them closely to make sure there's not disguised intelligence data in it, and they see evidence of another crime, like, for example, let's say evidence of a serial killer and surveillance or folders about the killer's planned next victims and so on. So what are you saying the government in that case should do? They can't rely on plain view? They can't do anything to stop the killer from proceeding to the next victim? Well, the concurrence in CDT would say you can't rely on plain view, you're out of luck. And I think that's the right approach. So in answer to my question, you're relying on Judge Kuczynski's concurrence? You would say the government cannot stop the serial killer in that setting? Well, Your Honor, I think there are other exceptions to the warrant requirement that might kick in, for example, in exigent circumstances or something like that. But absent a serial killer on the prowl type scenario, at a minimum what the government should do is what the government did in the Neslin case, which is as soon as you see something that's not within the scope of the warrant, you stop and you go get a warrant that authorizes you to search for that thing that you now think is there. But they didn't do that here. Instead, they spent three months rummaging through these files, sending them off to the National Center for Missing and Exploited Children, collecting other kinds of information to prove that Mr. Gartenlaub used the computers and occupied the home before they ever turned around and got that August 2014 warrant. And that's got to be beyond the pale. Okay. Thank you. Good morning, and may it please the Court. Ashley Gorski for AMICI, American Civil Liberties Union and the Electronic Frontier Foundation. As the Court just heard, this case involves the convergence of two factors that are critical to the Fourth Amendment analysis. First, the government obtained its evidence by creating complete copies of personal hard drives, searching through them, and then relying on the plain view doctrine. But as the en banc court recognized in CDT, application of the plain view doctrine in this context presents serious Fourth Amendment problems. Those problems are even more pronounced in this case because of a second factor. The searches were conducted pursuant to a secret FISA order based on relaxed standards of probable cause and particularity. As a result of these two factors, the FISA order functioned as a general warrant and led to a prosecution wholly unrelated to foreign intelligence. To ensure compliance with the Fourth Amendment, this Court should prohibit the government from using non-foreign intelligence information obtained through its electronic searches conducted pursuant to FISA. The government's justification for its over- Counsel, if I could ask this question. So then in response to my question, I'll take Appellant's characterization of the serial killer on the prowl. Is it your position that the government, having seen that information, can do nothing? It is our position that if, in the hypothetical you presented, the information indicated that the serial killer was planning a murder that was imminent and there was an imminent threat to the life of another individual, that the Fourth Amendment's exigent circumstances exception would apply in those circumstances. So even though the government would not be permitted to rely on the plain view doctrine, it could rely on the exigent circumstances exception to use that information in those limited circumstances. Okay, thank you. What about this for partially meeting your objection? If the trial court in in-camera review had information available to it so it could decide whether or not the plain view doctrine was applicable on a case-by-case basis, including in this case, isn't that one way to address your concern? I mean, other than just doing away with the plain view doctrine, which isn't likely to happen. I mean, CDT didn't do that. Your Honor, the en banc opinion in CDT recognized that the plain view doctrine raises serious Fourth Amendment problems when it's applied to searches of personal electronic devices. Yes, I know. And I'm saying here's one way you could address that within the current procedures. Through individualized review by the district court, recognizing that in certain circumstances the plain view doctrine may be appropriate. Your Honor, in this context, clear rules are important. The Supreme Court has made clear that in the Fourth Amendment context, clear rules are favored. And given that fact and given the fact that the Court has recognized the risks associated with the plain view doctrine in this context, we would urge the Court to adopt a more general use restriction. And the reason for that use restriction is that the government's justification for its over-seizure and its comprehensive searching on the front end is that it needs to locate particular information and has no other means of doing so. And if that is, in fact, the case, then there must be back-end restrictions and protections in order to ensure that the Fourth Amendment is not a dead letter in this context. Do we have room within current law to make a use exception? Absolutely, Your Honor. For example, the Supreme Court's opinion in Jacobson makes clear that a seizure that may be reasonable at the outset can become unreasonable depending on the government's actions with respect to that seizure subsequently. Well, the other thing is the move of technology, maybe. Oh, I'm sorry. The movement of technology as well here, I think, counsels in favor of the application of this kind of use restriction when you have the intersection of the two factors identified here, comprehensive searches of personal electronic devices, application of the Plain View Doctrine with respect to those devices, and FISA orders. As the Supreme Court made clear in Riley, searches of devices like phones and computers are more intrusive than searches of other forms of property, and the rules that applied for the Fourth Amendment that developed in the context of physical searches can be unreasonable when applied to digital ones. As we all know, computers hold extraordinary volumes of information. They function as banks, as personal diaries, as libraries, and more. And the data is also qualitatively different from the kind of information that would typically be found in a home. As a result, in this context, the government should be even more sensitive to the Fourth Amendment's particularity requirement. However, in practice, the contrary is true. Overseizure is commonplace, as are sweeping electronic searches that probe through the millions of files that may be contained in a single device. And if all of those files are deemed to be in plain view, then the constitutional problem is an even more serious one. The Court recognized this in CDT, and that risk is compounded here because of FISA, which relies on relaxed constitutional standards and results in sweeping and intrusive searches. Separately, although the government hasn't explained precisely how it found the child pornography on the imaged hard drives, it seems likely that investigators employed techniques or software that were specifically designed to search for those images, for example, using hashes. If the government, in fact, affirmatively searched for evidence of child pornography, the search violated the Fourth Amendment, regardless of whether the plain view doctrine applies. And finally, I would just note that the government asserts that imposing a use restriction here would result in recreation of the wall. That is not the case. As the Fifth Court of Review explained in In Re Sealed Case, the wall involved limiting the ability of FBI intelligence analysts to communicate with DOJ's criminal division about any foreign intelligence investigation, even those that related to foreign intelligence crimes. We're not proposing rebuilding the wall. A use restriction on non-foreign intelligence information in this context in no way affects the government's ability to communicate about foreign intelligence crimes. I see that my time has expired. Thank you very much. Thank you very much. May it please the Court, Anthony Lewis for the United States. During a search of defendant's residence, obvious evidence of a crime was found, all manner of child pornography organized with his personal files and correspondence. Defendant argues on appeal that no rational juror could have found that he knowingly possessed them. He raises a new Issue 1 appeal and challenges a number of the district court's rulings as to FISA issues. But defendant can't show any error by the district court, let alone error that was plain, clear, or an abuse of its discretion. I want to start with a moment on the probable cause standard, which uses the same standard in the Rule 41 context in FISA, a fair probability, but as to different facts. So while in the Rule 41 context, probable cause must be shown that there is likely to be specific types of evidence of specific crimes at a particular location, in the FISA context, what must be shown up front is that the target or targets of the FISA are an agent of a foreign power or a foreign power and that the places to be searched or put under surveillance were used by them. On the back end are minimization requirements, some of which are in the statute itself and some of which are imposed by the court that apply to acquisition, retention, and when appropriate, dissemination. Those minimization procedures are not like anything that exists in the Rule 41 context. So as to that probable cause finding, a fair probability, the same standard that's used in the Rule 41 context, this court should review that finding by the district judges that sit on the Foreign Intelligence Surveillance Court with the same standard for clear error and with great deference. That's what the Second, Fifth, and now the Eleventh Circuits have held. I'd like to discuss the issue that counsel and Anne McKee have spent some of their time addressing, which is what we might call the scope issue. That is raised for the first time on appeal. That accounts for why some of the record is not developed as to this, and I also want to address why there was no error, let alone error that was clear or obvious in dealing with it. At the outset, I think it's important to note that some of the child pornography videos contain names like 137 or 15. They were just numbers. There was no way to tell what was in those files without examining them. Moreover, many of the folders in which they were kept did not announce what the contents would be. Some were called VI or YG, which only on inspection one could determine that YG stood for young girl, and in one instance named a folder administrator with a subfolder system. But wasn't there like a whole database called ORJ data that had all these names on it, but it was all in one section? Yes. That was one folder of which there were seven copies. Okay. So why couldn't the government, when seeing this, I mean a lot of it strongly suggests, obviously suggests child porn, go get another warrant to go into that database? Yes, Your Honor. A few reasons for that. In general, in the FISA context, which is designed to try to seek foreign intelligence information that often relates to terrorism or hostile acts or weapons of mass destruction or clandestine intelligence activities, a requirement that agents stop their search in order to go get a warrant and get materials declassified and approval to do so would frustrate the purpose of getting that search in the first instance. And there is authority for that. I'd point to the Tron case in the Fourth Circuit cited by the defendant. And in that case, the defendant argued that there shouldn't be what was then a primary purpose test. There should be a sole purpose test in FISA. And the court rejected that, saying, oftentimes there are coincidental criminal investigations that go alongside foreign intelligence investigations, and some of them may result in prosecution. And to require the government to get a warrant in every foreign intelligence investigation doesn't adequately account for the government's compelling interest to collect and analyze foreign intelligence information. Counsel, if I could ask a question to you on that issue. So assuming that under FISA, government agents have to go full steam ahead for practical reasons and can't pause to get another warrant, would you address the contention an appellant makes about why there should be a use restriction on what's found? Yes, Your Honor. There are a few answers to that. The first is in the statute itself that says minimization, a process that applies through acquisition, retention, and dissemination, does not require the minimization of evidence of a crime. The second answer to that is that in a number of FISA cases, they have explicitly authorized the use of information obtained or derived from FISA in criminal prosecutions that don't on their face appear to bear any relationship to collection of foreign intelligence information. EISA and the Eighth Circuit is one of them. The tragic circumstances involved over here of a husband and wife murdering their daughter and the aftermath of that, but it's not the only one. Damra and Badia each involved manufacture of firearms. One involved false statements in citizenship applications. And so the bright line rule that Amici and appellant are arguing this court should adopt is not supported in any of those precedents. It would draw a bright line straight through them and contravene them, and it would contravene the statute itself. And on plain error review, that is not the time to announce this new rule that the district court did not have time to address and that is unsupported by both this circuit's decisions in the Rule 41 context and in the FISA context. Well, instead of overhearing evidence of murder, which is one thing where you use the exigency exception that was suggested, what about instead if you're going through and looking for foreign intelligence information, you find a tremendous number of financial transactions, which looks like it could well be money laundering. What do you do with that? Nothing? I mean, you just go ahead and prosecute it. You don't have to worry about the fact that you weren't looking for that. If it is evidence of a crime, then the minimization procedures do not call for it. Then the statute does not call for it to be minimized. There are other procedures in place, some of which I can't discuss in this open proceeding, but there are procedures in place that limit the use of that. Some of them are in the statute itself that attorney general approval is required in order to use information obtained or derived from FISA. And the Giordano case cited by appellant noted that that is a significant check on the use of surveillance powers by the government. So essentially FISA does not draw a line. Of course, those minimization procedures aren't binding upon the court. The trial court in its review should be able to look at, if there was a challenge, should be able to look at the minimization procedure and whatever the evidence was and in camera decide whether or not it was appropriate. Right? I would agree with you, Your Honor, that the district court should have the ability to determine whatever it needs to about how the search occurred, particularly if that issue were raised in the district court. I do want to address the notion of plain view that has been brought up because while there is authority to support and affirm what occurred based on plain view and in the Rule 41 context, the minimization procedures themselves really supply the answer in the FISA context. And while plain view is a doctrine that has been developed through a number of cases, including through CDT, it simply operates differently in the FISA context in which there is a robust set of procedures that exists on the back end of the search through acquisition, retention, and dissemination that is simply unlike what happens in a Rule 41 context. So to the extent that defendant was arguing the agent shouldn't have encountered the child pornography in this case in the first place, Hill and Adjani supply the answer. Here's my point. We don't know how the agent encountered it. If I'm sitting there as a district judge, which I normally am, and it gets encountered, I want to know, okay, in camera, I want to know how did it get encountered, what were you using for procedures, and if I don't know enough about the technology involved, then I'm going to go and I'm going to have a security cleared, top secret clearance expert for myself, for the court, all for my in-camera review if that issue gets presented. And a district court may well want to know those facts, particularly if a challenge is raised as to how particular materials were discovered in that. Well, but here's a different story, though. You're in an unusual position as a district court when you're sitting in one of these cases because, as Judge Posner pointed out in the Seventh Circuit case, the district court, because there's no advocate for the defense, has to be something of an advocate, which we're not used to, although he pointed out about five different instances where district courts get charged with that. And this is one of those situations where normally you just sit there and listen to what comes in. Here I would have to say, well, I want to know how they discovered the information, because, for instance, as I said in Wong, it was clear. They were going through graphic images. Here they are. I don't know what the situation was here, but depending upon what it was, if I were the district judge, I'd want to know how it was discovered. Understood, Your Honor. And I think the answer to that in part is that the district court's review here was not done in a vacuum. The defendant filed lengthy briefs in this case with detailed exhibits. The government filed an unclassified brief, a classified brief, a sealed appendix, noted the possibility of supplemental pleadings. The district court heard oral argument. The district court said that it took great care in reviewing the materials. And at the end of all that, its decision was not an abuse of discretion in not disclosing nor in reaching the conclusion that the searches and surveillance were legal in this case. Well, we have to review what the district court did. And it adopted an 11-page opinion verbatim that you submitted. The district court did adopt the government's proposed order. And, of course, this court has to review what the district court did. But its decision to disclose or not is one that's reviewed for an abuse of discretion. And in the Franks context, the decision that the district court reached at the time Well, wait a minute. I think we're reviewing what the district court did in a de novo, not an abuse of discretion. Ultimately, its decision to disclose or not is one that multiple circuits have held, although not this one, but multiple circuits have held. Or this one, though. Understood, Your Honor. There is persuasive authority that indicates the district court's decision, after conducting its in-camera review with input from both parties, that that decision as to its ability to reach a conclusion as to the legality of the search or surveillance is one that is reviewed for an abuse of discretion. So we're supposed to disregard the precedent in this circuit? Your Honor, I don't believe there is any precedent that says that this court should review FISA determinations, particularly as to disclosure, by any standard of review. It is simply an unanswered question in this circuit, but each circuit that has reached that issue determined that that was an abuse of discretion standard for the review. As to the Franks argument in particular, I want to note that the defendant had access to a great deal of information about the course of the investigation. And for the reasons I stated before, as far as why the district court's review and its decision that it could reach a determination as to the legality was supported in the record in a proper exercise of its discretion, for those same reasons the district court could take account of arguments made by counsel for the defendant in the district court. And it did. With respect to the sufficiency of the evidence, I'll touch on that briefly here. There is no argument that no rational juror could have found. They really didn't even argue that very much, except in their briefs. Then perhaps I should move on to another topic as well. Defendant argues that cleared counsel should be able to review the information here, but that sort of puts the cart before the horse. FISA calls for a necessity determination to be made up front before the district court can evaluate whether or not to disclose any of those materials. So the existence of SEPA, which was passed after FISA, does not offer any relief to avoiding the statutory mandate in FISA itself. I believe with that I've touched on most of the points that I wanted to raise with your honors, unless your honors have any additional questions for me at this time. No question here. No. No, but we're going to ask you to stay after the hearing to be available for us. Understood, your honor. Okay, thank you. Understood. Let me make two quick points in two minutes. The first point is the government's position is it cannot pause a foreign intelligence investigation long enough to get a warrant for something outside the scope of what it's been permitted to search for. What the government is saying, in other words, is that it can do exactly what CDT said it can't do, which is search everything on a computer, seize anything it finds that it considers to be evidence of crime, and use it in a subsequent prosecution. And it can do that. The only way it can do that is under the plain view doctrine. The minimization is not a Fourth Amendment exception. The Fourth Amendment applies here, despite the national security overtones, and there has to be some Fourth Amendment exception that permits the use of that information, and plain view is the only one that's available. The second thing I would say is on disclosure. In the 39-year history of FISA, one court, only one district court, has ever ordered disclosure, and it got reversed. So there's never been disclosure of FISA material. I implore the court to look at the legislative history. Look at what Congress intended. It is clear to me, at least, that Congress never intended that regime to exist. Congress clearly contemplated that in some significant number of cases there would be disclosure, that the disclosure would be necessary for an accurate determination of the legality of the search. Congress never contemplated, if you read the Senate reports, never contemplated that this regime would function for 39 years without ever having had disclosure. And I will add, finally, if ever there was a case where disclosure seems to be warranted, it would be this case, where the evidence of probable cause has to be suspect, given the flimsiness of the Harris affidavit, and given the fact that no foreign intelligence-type prosecution was ever brought, and given the fact that there's simply no evidence Mr. Gartenlaub was some sort of a spy for China. Well, what about the, let's say the Federal Public Defender Organization nationally had somebody that was a lawyer that was top secret cleared. Okay. And in these kinds of cases, then, that lawyer could be special counsel only for the top secret portion of the proceedings. Isn't that another way to address your concerns? There could be a system like that. Yes, Your Honor. And, I mean, any lawyer who reviews this material has got to have a security clearance, whether it's somebody like what you've described or whether it would be one of the defense lawyers. CEPA, which, as counsel noted, came into effect two years after FISA, provides a litany of procedures to follow in cases involving classified information, and it has worked extraordinarily well for all these years, for 37 years now. Enormously sensitive classified information has been disclosed to cleared defense lawyers without any notable incident that I'm aware of ever having been raised. There's no reason, none, to exclude FISA from the scope of CEPA, to treat it as if it is some sort of especially sensitive, precious stuff. It's not. It is no different in sensitivity than, for example, the nuclear secrets that were disclosed to cleared defense counsel in the Winho Lee case. The crown jewels, as they were described, and they were disclosed to defense counsel under secure circumstances, no harm was done. There's no reason FISA couldn't be handled the same way. I'm sorry I went over my time. I got carried away. It's fine. Okay. Thank both counsel for the argument today, and we will take U.S. v. Gartenlaub under submission.
judges: Wardlaw, Gould, Piersol